J. K. BARNES and M. H. SCHUSSLER, Plaintiffs, M. H. SCHUSS-LER, Appellant, v. CENTURY SAVINGS BANK ET AL., Appellee.

**Banks and banking:** REPRESENTATIONS OF OFFICERS: FRAUD: LIABILITY.
1   Where the cashier of a bank acts not for the bank but in his own personal interest, and for the purpose of keeping the matters involved from the knowledge of the bank, the bank is not chargeable with his fraud; but where he was acting for his bank in making a loan and in all matters referable thereto, including his representations made to the guarantor of the borrower's notes, and he undertook to make a statement of the borrower's liabilities it was his duty to make a correct statement, and failing to do so his act was the act of the bank, under the rule that where one of two innocent parties must suffer the one whose act brought about the wrong must stand the consequences.

**Same:** FRAUDULENT ACTS OF OFFICER: EFFECT. Where a cashier acted
2   for his bank and within the scope of his authority in making a loan and taking security therefor, it was not material to the liability of the bank that he acted fraudulently for the purpose of subserving some interest of his own, so long as the party with whom he was dealing had no knowledge of that fact.

**Same:** FRAUD: CONCEALMENT OF FACTS. Where a guarantor of notes
3   was endeavoring to ascertain the financial condition of the maker both individually and as a member of a former firm, before obligating himself for their payment, it was the duty of the cashier of the bank for which he acted to disclose the maker's contingent liability upon collateral or bonus notes given as security for the loan; and his concealment of the facts in that regard was a fraud upon the guarantor chargeable to the bank.

**Same:** FRAUD: RESCISSION: WAIVER. Upon discovery by a guarantor
4   of notes, given a bank for a loan of money to carry on a project according to a written contract of all the parties, that the cashier had

fraudulently represented the liabilities of the principal debtor, it was necessary for him to promptly rescind his contract of guaranty, if he would relieve himself of liability. By continuing the enterprise and allowing the bank to make further advances, without saying anything to the officers of the bank to whom the cashier's fraud was unknown, and failing to allege the fraud in his original action for cancellation of the notes as a ground of rescission, he waived the defense of fraud and his liability continued.

**Same:** RESCISSION: KNOWLEDGE OF FRAUD. Knowledge or the means of acquiring knowledge that a fraud was practiced upon a guarantor of notes, thus inducing him to assume the obligation, requires him to act with reasonable promptness in rescinding the transaction. An application of the rule does not require that he have full knowledge of the entire fraudulent transaction.

**Same:** CONTRACTS: SETTLEMENT AND RATIFICATION: EVIDENCE. Where a bank made loans and advances for carrying on an enterprise under a contract with the maker of notes given as security and the guarantor of the same, a subsequent contract between all the parties ratifying all previous transactions was a prima facie settlement of all such matters, in the absence of any fraud or deception inducing it; and in this action by the maker and guarantor to cancel the notes the evidence of misapplication of funds arising from the enterprise by the bank and its cashier, is held insufficient to overcome the effect of the ratification of previous transactions.

**Same:** TRUSTS: ACCOUNTING. Where a bank cashier acted under a written agreement as trustee for his bank and for the maker and guarantor of notes given the bank as security for funds furnished to carry on an enterprise, the bank would only be liable to the guarantor for such funds as it received from the enterprise in excess of those to which it was legally entitled, and the cashier as trustee would be obligated to fully account to the bank, the maker and guarantor, as beneficiaries of the trust; and an action by the bank for an accounting would be against the trustee, in the case of a misapplication of funds, for the benefit of all, and not against the maker and guarantor of the notes, unless they received more than they were entitled to.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, Judge.

SATURDAY, DECEMBER 13, 1913.

ACTION by the maker and guarantor of two promissory notes to cancel the same. Defendants answered, denying the allegations of the petition, and filed counterclaims, in which they asked judgments on the notes. On the issues joined, the case was tried to the court, resulting in a decree dismissing plaintiff's petition, and giving the bank judgment on its notes, but refusing relief to the bank on the accounting. Plaintiff Schussler and the bank both appeal; but as Schussler first perfected his appeal, he will be called appellant.— *Affirmed.*

*Parker, Parrish & Miller,* for appellant.

*Dale & Harvison, Clifford V. Cox,* and *Robert J. Bannister,* for appellee.

DEEMER, J.—One branch of this case was considered on a former appeal, the opinion being found in 147 Iowa, 267, and the present case was also before us on some interlocutory orders and an opinion filed, which will be found in 149 Iowa, 367. These cases, and especially the last one, state the issues with great fullness, and reference is made thereto for a detailed statement thereof. It is sufficient to say that after the case went back to the lower court for trial, the defendant bank filed a rejoinder or reply to plaintiff's reply, in which it denied the allegations of divisions 1 and 2 of the reply, pleaded a ratification by Schussler of the matters set up by him as amounting to a discharge, and also an estoppel on his part to rely upon any of his defenses because of his election to abide by the contracts complained of, and his ratification of all the actions of the bank and its officers. The right to an accounting by Schussler was admitted, and the bank also asked for such an accounting, and for a judgment against him. The notes in controversy are for $5,000 each, bearing date December 1, 1906, and due in seven and eight months, respectively. They were made payable to the Cen-

tury Savings Bank, signed by J. K. Barnes and indorsed as follows: "Payment guaranteed at maturity. Demand, protest and notice of protest waived by indorsers hereof. [Signed] M. H. Schussler." The bank, in its counterclaim, asked judgment on these notes. Schussler, who is the real party in interest on this appeal, admitted the execution and delivery of the notes and of the contract of guaranty, but pleaded in defense that his signature to the guaranty was obtained by false and fraudulent representations of the bank and its officers as to the amount of Barnes' indebtedness, and to concealment of the fact that as a part of the transaction Barnes was to pay a bonus of something over $5,000 for obtaining the loan. This was denied by the bank. As a partial defense, Schussler pleaded that the bank had assisted in diverting certain funds, which it was agreed should be applied on the notes in controversy to his, Schussler's, damage. This, too, is denied by the bank. And the bank also pleaded ratification of the alleged fraud and diversion of funds and an estoppel on the part of Schussler to rely on either defense to the notes. These, very shortly stated, are the issues in the case.

The record is very voluminous and the testimony somewhat contradictory, although as to many of the facts there is no dispute. It appears that Schussler, for many years, was a resident of Minnesota, and was there engaged in buying and selling timber and products of the forest. In the year 1904 he became acquainted with J. K. Barnes, his coplaintiff, who was a member of the firm of Casebeer & Barnes, also doing business in the same state. Schussler had considerable business with this firm for some years prior to the year 1906, when the firm dissolved, Barnes assuming the indebtedness of his firm, and among other items, was an account due Schussler of something like $5,000. Barnes had no financial resources, but Schussler seemed to have confidence in him, and undertook to finance him in a gunstock business at Des Moines, part of the indebtedness being about $2,000, advanced

by Schussler to Barnes to enable him to establish the business. Barnes ran along in a small way with his enterprise in Des Moines, but did not seem to be making much headway, and Schussler was interested in him because of his indebtedness. Schussler realized that if he received any part thereof from Barnes, it would be as a result of his business enterprises. Looking about, Barnes discovered a tract of walnut timber in Missouri, and, such timber being practically exhausted in Iowa, he went to Schussler and told him of the Missouri timber, and that it would cost $20,000. He, Barnes, represented to Schussler that he could get the money to purchase it from the Century Savings Bank (which we shall hereafter for sake of brevity call the Bank), provided he could secure an indorser upon his paper. The matter seemed to appeal to Schussler, doubtless for the reason that he hoped in this way to receive the money due him from Barnes. As a result, Barnes and Schussler went to Des Moines, and there met an experienced timber man, or cruiser, who had been over the Missouri land and made an estimate of the amount of lumber which might be derived from the tract. Schussler was convinced that the deal was a good one and the property worth the price asked. At the same time he asked Barnes for a statement of his financial affairs, and Barnes directed his bookkeeper to make out such statement, which was done from the books of Casebeer & Barnes, and not of Barnes alone. The parties then went to the Bank, and there met the cashier, Whinery, and the statement as to Barnes' affairs was exhibited to Whinery, who stated to both Schussler and Barnes that it was correct. The cashier also stated that Barnes did not owe the Bank more than the statement disclosed. After some further consultation, it was arranged that the Bank would furnish the $20,000, provided the debt was evidenced by four promissory notes in the sum of $5,000 each, two of which were to be guaranteed or indorsed by Schussler and paid after the other two, not so indorsed, were discharged. Barnes, at that time, had two separate gunstock contracts,

one of which was with the United States government, and the others were with different makers of firearms, and as a part of the loan transaction, the following agreement was entered into:

November 23, 1906. In consideration of the indorsements on two notes for $5,000.00 each, signed by J. K. Barnes and payable to the Century Savings Bank of Des Moines, Iowa, payable in seven and eight months after December 1, 1906, such indorsements made by M. H. Schussler of Floodwood, Minn. It is understood and hereby agreed by and between J. K. Barnes of Des Moines, Iowa, the Century Savings Bank of Des Moines, Iowa, and M. H. Schussler of Floodwood, Minn., that said Barnes agrees to turn over all proceeds derived from the sale of gun stocks to the U. S. government (cut from certain land purchased from the Merimac Spring Park Co. in Crawford and Phelps counties, state of Missouri) to the Century Savings Bank and said Century Savings Bank hereby agrees to apply all the moneys so received on the indebtedness of said J. K. Barnes for the purchase of the timber above referred to as follows: The first $10,000.00 so received to apply on and to pay notes given to Century Savings Bank by said J. K. Barnes dated December 1, 1906, and not indorsed by M. H. Schussler. The balance of all moneys so received by said Century Savings Bank to apply on and to pay certain notes dated December 1, 1906 and indorsed by M. H. Schussler until said notes are fully paid. And the next $5,000.00 to be paid to M. H. Schussler to apply and to pay certain indebtedness of that amount contracted by Casebeer & Barnes with Coolidge-Schussler which indebtedness has been assumed by said Barnes. It is mutually understood and agreed by and between all parties hereto that in no event without the written consent of all parties hereto, shall any funds, coming from the sale of any gunstocks to the U. S. government cut from above mentioned lands to be used for any other purpose than to liquidate the indebtedness herein referred to. J. K. Barnes. M. H. Schussler. Century Savings Bank. H. M. Whinery, Cashier. D. A. Byers, Witness.

This contract was drawn by Schussler, and will become important to one issue in the case. After the execution of

this contract, the four notes were signed, and two of them bore the indorsements already quoted. The enterprise either because of the panic of 1907 or mismanagement, was not a success; and it would have failed very shortly but for further aid given Barnes by both the Bank and Schussler. Schussler finally quit making advancements, but the Bank kept on doing so to some extent, and it was finally agreed that the business, or a part of it, should be turned over to an experienced timber man, and this was done. Here the Bank concluded to quit financing the scheme, and in December of the year 1907, the Bank, Schussler, and Barnes had a meeting in Des Moines at which they entered into another agreement as follows:

Whereas, the undersigned, J. K. Barnes, M. H. Schussler, and the Century Savings Bank, entered into a certain contract in writing under date of November 23d, 1906; and, whereas, the said Barnes, at the date of said contract had entered into a contract with the United States for the sale of gunstocks to said United States, the proceeds arising from which were to be applied as in said contract stated; and, whereas, said contract between the said Barnes and the United States has been heretofore canceled by the United States because of the failure of the said Barnes to furnish said gunstocks; and whereas, the said Century Savings Bank has been compelled to make advances to the said Barnes in order to meet expenses incurred in connection with the cutting of the walnut timber on the lands in said contract mentioned; and, whereas, it is now suggested by the said Schussler that he is in doubt as to whether H. M. Whinery, cashier of the said Century Savings Bank, who holds the title to said timber, as trustee for said Bank alone or as trustee for all the parties to said agreement: Now, therefore, it is hereby declared to be the true intent and meaning of the parties to said contract that H. M. Whinery has acted, is acting and shall act as trustee, not only for the said Century Savings Bank, but for the said Schussler and the said Barnes also.

And it is hereby further declared and agreed that all advances made or hereafter made by the said Century Savings Bank to said Barnes, or for his use and benefit, in the prosecution of the work in said original contract of November 23d,

1906, mentioned shall first be applied to the said Century Savings Bank, with interest thereon at eight per cent. (8%) per annum, from the date of advancing the same until paid.

Out of the remaining proceeds, payment shall be made of the notes mentioned in said original contract, aggregating ten thousand dollars ($10,000.00), given by the said Barnes to said Century Savings Bank, and not indorsed by the said Schussler.

Out of the remaining proceeds, payment shall next be made of the remaining notes mentioned in said contract of November 23d, 1906, executed by the said Barnes to the said Century Savings Bank and indorsed by the said Schussler.

Out of the remaining proceeds, payment shall be made to said Schussler of the indebtedness of five thousand dollars ($5,000.00), mentioned in said contract of November 23d, 1906, due and owing to him and arising out of prior transactions with Cascbeer and Barnes, payment of which has been assumed by said Barnes, as stated in said contract, together with any and all advances or additions thereto made by the said Schussler to the said Barnes.

Upon the payment of all of the foregoing indebtedness, then and in that case the said Whinery shall release to the said Barnes any and all interest that he may have, as trustee, in and to the timber tract, and the timber thereon mentioned in said contract of November 23d and to any remaining funds then in his possession as trustee.

And it is further understood that all actions and conduct on the part of the said H. M. Whinery in connection with the prosecution of the enterprise mentioned in said contract of November 23d, 1906, up to this date, is hereby ratified and approved.

It is understood that there is existing at this time a certain contract in writing for the sale of lumber between one Panabacker and said Barnes. It is the thought of all the parties thereto that it is expedient to procure the release from said Panabacker of said contract, providing the same can be done at an expense of not to exceed one thousand dollars ($1,-000.00). In the event that such release is procured, then the sum paid therefor by the Century Savings Bank, if any, to the extent of one thousand dollars ($1,000.00) shall be regarded as an advance on expenses incident to the enterprise.

It is further understood that all shipments of lumber, logs, gunstocks, or other products shall be made in the name

of H. M. Whinery trustee, and all payments for same shall be returned and made to the said H. M. Whinery, as such trustee.

It is further understood that the said Barnes and the said H. M. Whinery, trustee, shall keep an accurate debit and credit account of all the transactions in connection with the enterprise in this contract mentioned, and that the said books of account shall be open to the inspection and examination of all the parties to this contract at all times.

It is further understood that in the discharge of his duties as trustee hereunder the said Whinery shall exercise all reasonable diligence, but if the said Barnes shall in any wise fail in keeping and performing all the covenants herein contained to be kept and performed upon his part, then and in that case the said H. M. Whinery trustee, shall not be held liable therefor.

In testimony thereof, witness our hands hereto affixed at Des Moines, Iowa, this 17th day of December, 1907. [Signed] J. K. Barnes. [Signed] M. H. Schussler. [Signed] H. M. Whinery, Cashier.

This was entered into after a full consideration of the indebtedness of Barnes and the situation of the business generally. Matters were then resumed with another timber man in charge of the timber end of the venture and with the old and new man and Barnes in charge of the manufacturing end. Under this new agreement, the Bank advanced money until about the latter part of January, 1908, when the parties in interest all met again, some of them with their attorneys, went over the situation, and at that time a heated controversy arose over some past transactions, which will be hereinafter referred to. After this meeting, the Bank continued to make advances with Schussler's knowledge. At the time of this last conference all seemed to think the business could be made to pay, and they proceeded to carry it on until August of the year 1908, when Schussler came to Des Moines, and the Bank undertook to give him a statement of the entire transaction. Instead of going over it, Schussler left, and on September 4th of that year he joined with Barnes in commencing

this suit to cancel the notes, etc. Originally it was not bottomed on fraud. That issue did not get into the case until after the first appeal, and, to be exact, the pleading on which it was finally tried was not filed until October 13, 1909. The provisions of that pleading, so far as material, are set out in the second opinion of this court, hitherto referred to. It is now claimed that before signing the notes as guarantor, Schussler inquired of the cashier of the Bank as to the extent of Barnes' indebtedness to the Bank and to all other persons; that at the same time Barnes stated, in the presence of the cashier, that aside from his indebtedness to Schussler he was not indebted to the Bank or to any other person, and that the cashier stated the amount of Barnes' indebtedness to the Bank, and also affirmed that the Bank had ample security for this indebtedness; that as a matter of fact, Barnes was then indebted to the Bank or its cashier in the sum of approximately $5,000 upon notes or obligations given by him as a bonus or claimed bonus for the $20,000, which indebtedness was fraudulently concealed from Schussler, and that Schussler would not have signed the notes as guarantor had he known of this and some other indebtedness by Barnes to the Bank, which was also concealed. This other indebtedness is said to have been an unsecured indebtedness of Barnes to the Bank in the sum of $4,500. It is also claimed that Schussler did not learn of this extra indebtedness until long after he had signed the guaranties, and that by reason of the fraud perpetrated upon him, he is absolutely released as guarantor. The Bank, while not denying the making of the bonus notes, which will be hereinafter referred to, asserts that if there were any such notes, they were taken by its cashier for his own ends and secretly; that it never had any knowledge thereof, either actual or constructive; that, as a matter of fact, they never did constitute an indebtedness on the part of Barnes, and during the trial of the cases these notes were produced and put into the record for cancellation. It also avers that Schussler received full information regarding these

notes on February 1, 1908, and that instead of immediately repudiating his guaranties, he continued his connection with the Missouri enterprise, gave the Bank no notice of the bonus notes made to it; but, still believing that the enterprise would pay out, he co-operated with Barnes, and the cashier to that end, permitted the Bank to put more money into the venture, and made no complaints to the Bank or its cashier until he joined with Barnes in the commencement of this original action on September 4, 1908, and that as a matter of fact, he did not raise the issues now presented until the amended petition was filed in October of the year 1909. The suit as it originally stood was for an accounting and the cancellation of the notes, because they were paid in a manner to be hereinafter stated.

For the purpose of getting this main issue clearly stated, we may here eliminate all of Barnes' indebtedness to the Bank or to other persons at the time the loan of $20,000 was made, for the testimony does not support the claim that there was any other indebtedness which was concealed, save the bonus notes above referred to. As to these, the testimony shows that it was secretly agreed between the Bank cashier, Whinery, and Barnes, that Barnes should execute his individual bonus notes to Whinery in the sum of approximately $5,000; $500 of which was for services rendered by Whinery to the firm of Casebeer & Barnes, for which amount a note was executed upon the understanding that he would take up the matter of the $20,000 loan with his Bank, and before the matter was taken up with the Bank, Barnes executed four other notes of $1,000 each, the character of which will hereinafter be explained, and it is claimed that another $1,000 was to go to the Bank in addition to its interest on the $20,000, but that this was not evidenced by any note. According to one version of the transaction, these notes, amounting to $4,500 were given to Whinery, the cashier, to induce him to take up the matter of the $20,000 loan; ostensibly $500 of the amount was for services rendered the old firm of Case-

beer & Barnes, or Barnes individually, prior to the application for the $20,000 loan, and the $4,000 was either to induce Whinery to take up the matter with his Bank and get the loan through, or to secure to Whinery a portion of the profits which it was supposed would grow out of the Missouri venture. ,Upon this point the testimony is not very clear, but both sides seem to treat the $4,500 in notes as a bonus to Whinery for getting the loan through the Bank. As a matter of fact these transactions were concealed from Schussler, and we think also from the officers of the Bank, aside from Whinery, who was the party to be benefited thereby. Whatever the exact facts regarding the inducements for the making of the notes aggregating $4,500, it appears beyond all dispute that at the time the notes for the $20,000 loan were written which was some time before Schussler appeared upon the scene, Barnes signed a note of $500 to the Waukee Savings Bank, bearing date November 5, 1906, due six months after date, which note was marked paid by the payee therein named on December 10, 1906, one note of $1,000 to the Waukee Savings Bank, one of the same amount to the Bank of Earlham, another of like amount to the Citizens' Bank of Dallas Center, and still another of the same amount to the Citizens' Savings Bank of the same place. One of the notes bore date December 6, 1906, but the others were dated December 10th of the same year. They matured May·10, June 10, July 10, and August 10, 1907, respectively Some were guaranteed and some indorsed by Whinery, defendant's cashier. Each of the four notes contained the following statement: ". . . Having deposited herewith as collateral security *various collaterals in the hands of the Century Savings Bank of Des Moines, Ia., such as bills of laden, bills of shipment of gunstocks to Winchester, Remington, Rock Island, etc., who are in the purchase of gunstock business.*" The $500 note contained a somewhat similar statement, although less specific. The notes in suit bear date December 1, 1906, and the contract which we have already set out between the Bank, its

cashier, Barnes, and Schussler, while bearing date of November 23, 1906, was executed at the same time that Schussler signed the guaranty, and the transactions with reference to the signing of the notes and contract were in fact one.

The claimed verbal agreement that the bank should have $1,000 bonus in addition to the 8 per cent. interest specified in the notes is not very clearly explained in the testimony, but Barnes said that the arrangement was that when each of the $1,000 notes was taken up, the Bank was to receive $250 in addition to the interest, making $1,000 in all. As we understand it, Barnes paid the $500 note executed by him, but he never did pay any one of the $1,000 notes or the $1,000 bonus to the Bank, or any part thereof. On the contrary, during the trial these bonus notes were produced by the attorney for the Bank, and tendered for cancellation or for delivery to Barnes, if he desired them.

To a better understanding of the matter, we here quote from the testimony of Barnes, as follows:

Q. Referring now to these bonus obligations of four $1,000 notes and the verbal undertakings to pay the Century Savings Bank a commission of $1,000, state whether or not in making your arrangements with Mr. Whinery, the cashier of the Century Savings Bank, he insisted on the giving of those obligations by you as a necessary condition to his extending you this loan of $20,000. A. Yes, he made it very clear to me that that was absolutely necessary if I got the loan at all. Q. Your object, then, in making these or going into this undertaking and making these notes, was in order to procure the loan of $20,000? A. Yes, sir. Q. Evidenced by the four $1,000 notes? A. Yes, sir. Q. And that advance was made, the $20,000? A. It was made upon the completion of arrangements for the purchase of the timber. Q. What was your reason, Mr. Barnes, for refraining from telling Mr. Schussler about the existence of these four notes for $1,000 each, and of this $500 note, and of the $1,000 verbal obligation to the Century Savings Bank? A. I naturally did not care to tell him about that. Q. Why not? A. Well, I naturally supposed it would queer the deal if I did. Q. State, if you please, if you

had any conversation with Mr. Whinery in regard to conceal-
ing from Mr. Schussler the existence of these four notes of
$1,000 each, and this $500 note and the $1,000 verbal obliga-
tion. A. Yes, I had that understanding that this was not to
be known to the officers of the Bank, nor neither to Mr. Schuss-
ler. Q. What did you say to Whinery, and what did he say
to you about it, and when did you have the conversation? A.
The conversation was first at the time he spoke of the matter,
and we decided to do these things. Then in his writing to me
about payment of these notes he always told me in these let-
ters to keep that confidential.

The cashier, Whinery, in writing to Barnes about one
of these notes said: "In reply to my letter contained in this
envelope, relative to the $1,000, note, please address the let-
ter to me personally," and at another time wrote, "It will be
quite a help to your business if this note is liquidated at this
time."

Schussler testified as follows, regarding this matter:

When we reached the bank Mr. Whinery asked me what
I thought of the proposition, and I told him it looked all right
to me, *provided Mr. Barnes' affairs were in the condition that
he said they were, and I told him Mr. Barnes had made me a
statement, and that he also told me he was doing all of his
business with the Century Savings Bank, and that he owed
the Bank some money,* but all of the money that he owned was
protected by these shipments. Mr. Whinery said, '*Anything
Judy tells you in the matter you can rely on.*' He said, '*We
have done business here a good while, and it has been rather
extensive, and we think a lot of him, and anything he tells
you in the matter, you can just depend upon him.*' I said,
'*Then you know this is all Mr. Barnes owes?*' and he said,
'*It is.*' Judy was Mr. Barnes. . . . In this conversation
*Mr. Whinery told me that the only money that Mr.
Barnes owed him was for advances they had made on ship-
ments,* and that he assigned the bills of lading or invoice of
these shipments to them, and they made advances on them, and
that *in every case there was more than enough coming in to
take care of these notes that Barnes had given the Bank,* grow-
ing out of the old Casebeer & Barnes business, or of the Barnes

business succeeding Casebeer & Barnes, *and that Mr. Barnes had an equity in almost every shipment.*   Q. What indebtedness did Mr. Whinery then state to you existed from Barnes to the bank, and how did it arise?   A. He said that they had no indebtedness; that Mr. Barnes owed the Bank nothing except what was covered by these shipments.   Q. And it was an indebtedness to the Bank for advances made by the Bank to Mr. Barnes on the security of these shipments of gunstocks manufactured here in Des Moines?   A. Yes, sir.   My recollection is that Mr. Whinery stated that this indebtedness secured in this manner was between $11,000 and $12,000.   This conversation between myself and Mr. Whinery occurred in the presence of Mr. Barnes.   *I showed Mr. Whinery the written statement Mr. Barnes had made to me, and he told me that was correct.   Q. You showed Mr. Whinery the written statement to which you have referred?   A. Yes, sir.   Q. And Mr. Whinery stated to you that that was correct?   A. Yes, sir.*   Q. You may state, Mr. Schussler, whether or not the statement made by Mr. Whinery and by Mr. Barnes in the presence of Mr. Whinery in regard to the state of Mr. Barnes' finances *had anything to do with inducing you to sign the guaranty on the notes and the guaranty contract.   A. Why, yes, it led me to believe Mr. Barnes' affairs were in good shape, and that he could carry this matter out.*   Q. You may state *whether or not you relied upon the information that you obtained from Mr. Whinery* in regard to the condition of Mr. Barnes' finances.   *A. I certainly did.*   Q. You may state whether or not you obtained or received from either Barnes or the bank *any consideration or inducements* whatever for the execution of these guaranties.   *A. No, sir; nothing except the $5,000 that he owed me that Mr. Barnes said he would be able to pay out of the proceeds of this business.*

Whinery was not a witness for either party, but the managing officers of the Bank, each and all, testified that they had no knowledge whatever of these bonus transactions.   We have heretofore set out the contract between Barnes, Schussler, and Whinery over date December 17, 1907, and here observe that by the terms of this contract, Whinery's connection with the Missouri venture from November 23, 1906, down to the date of the contract were each and all ratified and approved; but

it clearly appears that down to that time Schussler had no knowledge of the bonus notes above mentioned.

In this connection, although perhaps a little out of order, we set out a contract between Panabacker, Barnes, and Whinery, trustee, entered into on November 8, 1907. It reads as follows:

St. James, Mo., Nov. 8, 1907.

It is hereby agreed between the parties hereto as follows:

First. It is agreed that J. Panabacker shall take charge of the cutting and hauling of the walnut lumber that he has purchased from J. K. Barnes, in what is known as the Spring Park Co. land and in said cutting and hauling said J. Panabacker agrees to give the said matter his personal attention and use every effort to have said lumber manufactured and hauled at the very lowest price possible and agrees to push said work as fast as possible for which services the said J. Panabacker agrees to make no charge for his time.

Second. It is understood that in manufacturing said timber, that what are known as export logs, 19 inches and over in diameter, shall not be sawed up and that the remaining portion of said logs, shall be cut into lumber, suitable for the contract between J. K. Barnes and J. Panabacker, except that the said J. K. Barnes may direct what portion thereof he desires to be cut into gunstock material.

Third. It is understood that in paying for this work, a certain check receipt shall be used, payable at the bank of St. James and shall be given by the said J. Panabacker and O. K.'d by the said J. K. Barnes before said payment is made. And said checks shall distinctly state for what the same is given and the same shall only be given for bills actually made in connection with the cutting and getting out of said timber. This, however, to include bills that have already been made which shall be passed upon in like manner by both of said parties and such checks as are given, for old accounts shall distinctly so state.

Fourth. It is understood that when this lumber is delivered at the railroad station, the same shall be inspected and its value determined in accordance with contract between J. Panabacker and J. K. Barnes, which amount shall be certified to H. M. Whinery, trustee. It is further agreed that the lumber, however, shall still remain the property of H. M.

Whinery, trustee, until the same is paid for, as hereinafter stipulated. When the said J. Panabacker shall receive orders for the shipping out of said lumber or any part thereof, the same shall be shipped in the name of H. M. Whinery, trustee, and the proceeds shall be made returnable to him so long as there is yet anything remaining due from the said J. Panabacker on said lumber. If any of the said lumber is sold on track, then the proceeds derived therefrom, shall be paid to the said H. M. Whinery, trustee, until the indebtedness of the said J. Panabacker shall be liquidated. It is further understood that the said J. Panabacker shall have credit for sixty days after said lumber has been delivered, without interest, if within said time, said indebtedness has not been paid, a balance shall draw interest of 6%. It is further agreed that if the said J. Panabacker has not so sold and disposed of said lumber and paid therefor by July 1, 1908, that the said H. M. Whinery, trustee, shall have a right if he so desires, to sell and dispose of said lumber and apply the proceeds on the indebtedness, unless the parties hereto shall mutually agree to an extension of time.

Fifth. It is further agreed that the said J. Panabacker shall have charge of the hauling of the gunstock lumber as well as the cutting, if the said J. K. Barnes shall haul any of the said lumber with his teams or engine, he shall receive the same compensation therefor, and paid in the same manner as other haulers shall receive.

Witness our hands, this day and year first mentioned. J. Panabacker. [Seal.] J. K. Barnes. [Seal.] H. M. Whinery, Trustee.

Such was the situation of affairs when Barnes with his attorney (one Maxey), Schussler, and Whinery met for some purpose at St. James, Mo., which was near the timber land, and Barnes' attorney accused Whinery of having taken the bonus notes. As the testimony with reference to this meeting is vital, we here set out the substance thereof. Schussler testified:

Since the execution of the notes, Exhibits 1 and 2, and the contract, Exhibit A, I have learned that at the time they were executed Mr. Barnes had also obligated himself to a

considerable extent for commissions or bonus in connection
with the procuring of this loan. I learned that in February,
1908, *at St. James, Mo.,* at Mr. Barnes' office at that place,
where he was handling this timber project. Mr. Whinery was
present there at St. James at the time I acquired this infor-
mation. Mr. Whinery was then still the cashier of the Cen-
tury Savings Bank. The matter came up in this way: Mr.
Maxey, who was Mr. Barnes' attorney, was there. There was
present Mr. Barnes, Mr. Maxey, Mr. Gerhart, Judge Prouty,
Mr. Whinery, and myself. I had gone down there on a meet-
ing to see how things were going. Mr. Barnes was complain-
ing of the management, and this was in the back room of one
of the banks there at St. James. Mr. Maxey and Mr. Whinery
had had some words about something, and Mr. Whinery made
a statement that when he wanted Mr. Maxey's advice he
would let him know, so Mr. Maxey at that time accused him
of having these (bonus) notes, and that it was done before
this deal was made here with Mr. Barnes and all arranged,
and when Mr. Maxey got through I turned to Mr. Whinery
and *I said, 'Are these the facts, Mr. Whinery?' Mr. Whin-
ery did not deny them, nor did he affirm them.* In his dra-
matic way Maxey pointed his finger at Whinery and called
him a crook, and said he had exacted of Mr. Barnes bonus
notes in order to get him into this Missouri deal. Maxey
said to him: 'The time you loaned him this money you exacted
of Mr. Barnes these bonus notes in order to get him into this
Missouri deal. You loaned him this money and executed these
bonus notes, and we will put you over the bars.' Mr. Whin-
ery sat there like a melting lump of sugar. He did not deny
and did not affirm. I asked him: 'Mr. Whinery, are these
the facts? I am very much surprised.' As a matter of fact,
when Mr. Maxey sprung this I thought I was getting his foot
into it. Mr. Whinery did not deny, and then Mr. Barnes was
standing over near me, and I asked him if that was the fact,
and he said it was. I learned there in the presence of Mr.
Whinery that these bonus or commission obligations amounted
to $5,000. That was the statement Maxey made. Maxey ac-
cused Whinery of being a crook and exacting $5,000 from
Mr. Barnes in order to negotiate this $20,000 loan.

Q. State whether or not you have ever seen any of these
so-called bonus notes or obligations. A. I saw a note for
$500 that Mr. Barnes said was a bonus note.

And on cross-examination, he said:

Q. Do you think you were in St. James on the Thursday following the date of the telegram? A. Well, we kept that appointment, kept the appointment all right. I met Mr. Prouty there. *It was at that time that I learned of the bonus notes.* At that time Mr. Barnes was complaining to Mr. Whinery and myself in regard to the management down there. He claimed that the men in charge were not looking after his interests, and complained to Mr. Whinery, and suggested that they have a meeting down there, and we went down to see what the situation was. Q. What did you learn the situation to be? Just tell me. A. I found they were working there. Mr. Barnes had been running the mill, and at that time they were logging, cutting logs out of the woods. Had some logs in St. James, and I believe they said they had some logs that were scattered along the Merrimac river. I did not go down through the Merrimac river bottoms, in addition to St. James. At that conference I learned that Barnes had a body of logs lying felled in the Merrimac river bottom, in addition to those that had been transported to St. James. I don't think Mr. Barnes had any credit at St. James at that time. His credit there had been exhausted long before that. Q. You knew that for some time prior to that the Century Savings Bank had been advancing money to get the logs felled and get them out of the bottom, didn't you? A. Yes, sir. Q. And for the reason Mr. Barnes had no money to pay the labor necessary to accomplish that result? A. Well, I understood Mr. Whinery had taken charge as trustee, and the Century Savings Bank was furnishing money to defray the log expenses there. They had a lot of material on hand there they proposed to sell and convert into cash to reimburse the Century Savings Bank. At that time the work was pretty well completed, and it was more a question at that time of converting material into money than it was of making further advances. Q. Do you say you did not know that the Century Savings Bank would make future advances to get logs yet in the bottom out and get them ready for market? A. No, I thought they would make future advances.

. . . I remember being here in Des Moines, but not whether it was August 22d. It probably was. I saw a lot of papers and vouchers, but there was no statement or any

books. The papers that were handed me were papers between Mr. Whinery as trustee and the Bank. There were no books at all, just vouchers and drafts that Mr. Whinery had drawn on the Century Savings Bank that had been paid. Q. For advances made in connection with operating expenses of the business down there? A. I don't know. Q. Many of a date subsequent to January 30, 1908, you remember that, too? A. I don't remember going through them, because there was so much of it. I requested a statement, and these were given to me, and I told I could make up my own statement of the affair down there from the vouchers given to me. I was given the data, and asked to make my own statement, and the assistance of Miss Houston, the clerk at the bank, was volunteered me, and any assistance I wanted. You (Mr. Harvison) were very nice about it, and I took it at the time you were perfectly willing I should make up the statement. I remember that I could not stay and prepare the statement with the assistance of any one connected with the Bank, because I had an engagement in Chicago. I said I would try to run over from Chicago. I expected to return to Des Moines from Chicago, but was detained in Chicago, and had to go back home from there. I wrote the letter Exhibit 27, dated September 7, 1908. I mentioned the bonus notes in that letter, Exhibit 27, and I mentioned them to Mr. Whinery the time I found it out and asked if it was so, while we were at St. James. I also think I called your attention to the matter when I was here in August. Q. Then from the time of your discovery up to the time you were here in August, had you called the attention of any officer of the bank to it other than to speaking to Mr. Whinery about it at the time you discovered it? A. I don't know that I had. No demand had been made on me, particularly up to that time. Q. You didn't mention it to the president of the Bank prior to August, 1908? A. I don't know that I did. Q. You knew from January 30, or early in February, 1908, the Bank was advancing large sums of money in the furthering of the enterprise of getting logs out of the bottom, milling them and preparing them for market? A. I knew the Bank had made an original advance there to take care of some labor. The supposition was that the revenue from the sales of material there would be more than enough to cover the running expenses, and outside of the original advance there probably was not any advance necessary. Now

I don't know what advances the Bank made.  Q. A little
while ago, you told me at the interview at St. James, Mr.
Barnes was complaining of the management.  Who was in
active control of the operations, say from the 17th of Decem-
ber, 1907?   A. Who was in active control?   Q. Yes, in
active management of the ground?   A. Along about the 1st
of January or around about Christmas time, T. J. Maher was
there.  He was a cruiser in our employ.  A timber man who
makes estimates on standing timber.  He is the person men-
tioned in some of my letters.  Q. How long had he been in
your employ?   A. I should say about three or four years at
that time.  Q. And how did he happen to be down at St.
James managing this walnut lumber enterprise?   A. I don't
know that he was managing it.  He was there at St. James,
but I don't know that he was manager there.  I sent him down
there to make an estimate of the standing timber that was
left long in December when we had a meeting here (in Des
Moines), and after he came back, Mr. Whinery wanted him
to remain there.  That was December, 1907.  I recognize my
signature to the instrument, December 17, 1907.  It was after
that instrument was made that Mr. Maher was assisting in
the enterprise at St. James.  I sent him down there, and the
day before Christmas I got a telegram from Mr. Whinery
asking me to come down here, and I came down and met you
(Mr. Harvison) and Mr. Whinery at the bank on Christmas
morning, and at that time an arrangement was made to send
Maher down there, and I think he left within a day or two
after that.  He remained down there about three months.  He
knew nothing about the gunstock business, but went down
there to superintend cutting these logs and getting them
to the mill.  That was all he was there for.  Mr. Maher had
no experience in the gunstock business.  His only experience
was in getting out timber.  When I entered into this guaranty,
the only hope I had of getting my money was in the profit
arising out of this transaction which Mr. Barnes had in pros-
pect.  Q. On January 30, 1908, when you were at St. James,
you were yet hopeful that that project would result success-
fully, were you not?   A. Yes.  It was not until some time
later that the result finally reached was known.

    We here quote some letters written by Schussler to the
Bank:

Floodwood, Minn., Apr. 4, 1908. Mr. H. M. Whinery, Cashier, Des Moines, Iowa—Dear Sir: Your favor of the 30th at hand and noted. Wish to say I was under the impression, from what Mr. Barnes wrote me, that the only mortgage against the property there at St. James was the mortgage held by Aultman-Taylor Co. They made him a proposition if he would pay them $100.00 they would take back the engines which they sold him and satisfy the mortgage. Mr. Barnes claimed he did not have the $100.00 to satisfy this mortgage, and I told him if he would assign the Aultman-Taylor mortgage to me that I would advance him the $100.00. My idea in regard to this was that unless the Aultman-Taylor claim is satisfied that they would step in and take this machinery and it would be a loss to all of us, and I did not want anything to happen to this machinery until at least we were through with it. My suggestion, when at St. James, to Mr. Barnes, was that when he got the Aultman-Taylor mortgage released that he turn this property over to you as trustee, but it was not until later that I found out the true facts concerning the mortgage on the machinery, and it was only to help Mr. Barnes out that I agreed to advance the $100.00 and take this mortgage. This was all to have been fixed up something like a month ago, and I instructed Mr. Maher a day or two ago that unless this matter was fixed up at once and before he left there, I would withdraw my proposition. Yours truly, M. H. Schussler.

Floodwood, Minn., Apr. 11, 1908. Mr. H. M. Whinery, Des Moines, Iowa—Dear Sir: Your favor of the 7th at hand. I think the action you took in regard to sending your son James R. Whinery to St. James to look after things is a good one. Also to have the lumber scaled up so you may know just what you have got there. I was very much disappointed that you did not settle with Mr. Maher before he left, as I fully expected you to do this and see no reason why it should not be done. When I first took Mr. Maher down there with me, it was to look over the situation so that I would be personally informed in regard to it, but after he came back from St. James and I met you in Des Moines the second time, it was by your request that we kept Mr. Maher there. We needed him here and had to hire another man to take his place while he was away. If Mr. Maher was not satisfactory

and did not fill the bill, I do not think you should have kept him there, but if he did, think he is entitled to his pay, and you surely would not expect me to pay his wages personally while he was doing other work. I think you have a record of Mr. Maher's time down there, and I wish you would send a check to him in our care, at the rate of $125.00 per month. This should be charged up against the job down there, and I trust you will see it in this light, and adjust this matter. Yours truly, M. H. Schussler.

Floodwood, Minn., May 19, 1908. Mr. H. M. Whinery, Des Moines, Ia.—Dear Sir: Your favor of the 14th at hand and noted. I am very glad to know that as far as manufacturing at St. James that you are through, and I hope you will be able to dispose of the inch lumber which you have on hand at a good price soon, so that this matter can be closed up. I have been away from home so much lately and expect to be for the next two weeks, that I cannot tell just at present just when I can get to Des Moines as I have to take a little trip to Canada, and also may be called to Washington. If things shape themselves, however, so that I can get down there after the first of the month, I will advise you, but it looks very much as though I would not be able to get down there before the first of June. Yours truly, M. H. Schussler.

Minneapolis, Minn., June 12, 1908. Mr. H. M. Whinery, Des Moines, Ia.—Dear Sir: Your favor of the 9th to Floodwood has been forwarded to me at Minneapolis. We have moved our main office to Minneapolis, and I am spending the greater part of my time here. I am going north to-night to be gone several days, and on my return I will advise you how soon I can get to Des Moines. I should, however, in the meantime, be pleased to have a statement of about how the St. James matter stands, to go over before I come to Des Moines, if you can send it to me. Yours truly, M. H. Schussler.

On September 5, 1908, the Bank wrote Schussler as follows:

Sept. 5, 1908. Mr. H. Schussler, Esq., 826 Metropolitan Bldg., Minneapolis, Minn.—Dear Sir: The inclosed original notice in the case of J. K. Barnes and M. H. Schussler v. the

Century Savings Bank, et al., has been served upon us. This action is so flatly in contradiction of all your conduct up to this time, and of your repeated assertions that you would make payment of the notes indorsed by you, that I am at a loss to know whether or not you have authorized Mr. Maxey to institute this suit on your behalf so far as you are concerned. If you have done so, of course we will govern ourselves accordingly. Let me ask you to return the inclosed notice if you will, though it is not very important, and advise us as promptly as may be of your attitude in this suit, and oblige. Very truly yours, W. G. Harvison, President.

To which Schussler made this response:

Minneapolis, Minn., Sept. 7, 1908. Mr. W. G. Harvison, Pres., Century Savings Bank, Des Moines, Iowa—Dear Sir: Your favor of the 5th inclosing original notice in the case of J. K. Barnes v. Century Savings Bank, at hand. Replying to same, beg to state, some two months ago, I requested your Mr. Whinery to make up a statement showing the condition of the J. K. Barnes matter, as conducted by Mr. Whinery as trustee, and two or three times since that time I have requested a statement, but up to the present time have received none. So that while you have made a demand on me for payment of notes which I indorsed for J. K. Barnes, yet for some reason, you evidently are keeping me in the dark regarding the exact condition of affairs. In the first place, you understand, I did not receive one cent from Mr. Barnes nor from the Century Savings Bank at any time since this deal with Mr. Whinery and Mr. Barnes was made. My only connection in the affair was that Mr. Barnes claimed that this was an opportunity for him to make some money so that he could pay me an indebtedness which Casebeer & Barnes had contracted previous to that time, and which Mr. Barnes had assumed, and at the time Mr. Barnes made this loan from your bank, there was an agreement made between Mr. Barnes, your bank and myself, that the funds derived from the operation of this timber should be used in a certain way to reduce certain indebtedness, all of which you are familiar with. At the time I was asked to make this endorsement as additional security for Mr. Barnes to get this loan, I did not understand that Mr. Barnes had given Mr. Whinery notes to the extent

of four thousand dollars as additional profit to the bank for this loan; and I am also informed that an effort was made to collect at least one of these notes out of the proceeds derived from the business at St. James, before any of the other indebtedness was taken care of, in accordance with the understanding which we had between us. Also, I understand that Mr. Barnes at the present time, claims to have no property whatsoever, and it would be a very easy matter for him to be relieved of all his indebtedness to you or to me, by going through bankruptcy. Mr. Barnes, of course, maintains that he has not been treated right, consequently does not propose to pay this claim which you have against him, neither does he propose to pay any additional claim I might have against him on account of paying the notes which I have endorsed and which you hold. It simply leaves me in a position that you expect me to pay half of this loan and place me in a position where I have no recourse from Barnes, and also keep me in the dark in regard to the affairs of the trusteeship. I was under the impression that some concessions might be made by the bank, and that this matter could be settled satisfactorily to all concerned, but I am led to believe, from conversations which I have had with you, that there is only one way I can settle the matter, and that is to pay in accordance with my endorsement. I beg to say that I had all confidence in the world in the Century Savings Bank and its officers, and was entirely willing to let Mr. Whinery handle this, and supposed that all interests would be protected. The first shock I had in regard to this matter was when I found that three thousand dollars which was received by the bank for gunstocks, and which should have been applied in a certain manner in accordance with our contract, was not so applied, but that it had been used by the bank to apply on an old indebtedness; and the next thing that rather shook the foundation, was when I was informed at St. James the last time I was there, at the solicitation of Mr. Whinery, that it developed that Mr. Whinery had demanded of Mr. Barnes the sum of four thousand dollars, or an additional twenty per cent. for letting him have this money, when all the security and everything was in your possession. I was very much surprised to find this condition, as I did not think up to that time, that I was being misled in this matter. Then, again, at the solicitation of your Mr. Whinery, I allowed Mr. Maher to remain at St.

James as an employee of Mr. Whinery as trustee, and then Mr. Whinery refusing to pay him his salary, I had to pay it personally. All of these things led me to believe that I was not being treated exactly right in the matter, and certainly not in accordance with the understandings and talks that we had had. I dislike very much to be party to an action of this kind but as I see no relief either from you, or from Mr. Barnes, and inasmuch as Mr. Barnes has taken this action and has requested me to join with him in the matter, and with the opinion that no compromise could be effected with you, I see no other way but that I will be compelled to join with Mr. Barnes in this action. I regret very much that things have taken this turn, and had I received one penny out of these funds, I would not in any way try to avoid the issue. But inasmuch as Mr. Barnes is seeking relief and by going through bankruptcy could get the relief which he desires, I see no other course open to me. I return herewith the original notice as requested, and beg to state, that if you have any suggestion to make, or any compromise to offer, I would be very glad to consider same, and matters might be arranged in a more amicable way. Yours truly, M. H. Schussler.

Barnes gave the following version of the matters relating to Schussler's knowledge of the bonus notes.

On February 1, 1908, I first informed Mr. Schussler that I had given these four notes of $1,000 to which I have testified. That was at St. James, Mo., in the back office of the St. James Bank. Q. You were present at St. James, Mo., at the time when Mr. Whinery and Mr. Schussler and Mr. Gerhart and Mr. Maxey were there? A. Yes, sir. This was February 1, 1908. It was on that occasion that I first informed Mr. Schussler as to the existence of these so-called bonus obligations.

On cross-examination he said:

As stated before, it was February 1, 1908, that I told Mr. Schussler all about this bonus transaction. It was during the interview at St. James. I told him practically what I have testified to here. I told him that at the time the loan was made to me, Mr. Whinery refused to go ahead with it

unless I would sign these bonus notes, and that to induce him to make the loans I had to give these bonus notes.  Q. What did Mr. Schussler say?  A. He said this was all news to him. I don't remember what else he said.  Q. At that time, what was the situation with respect to logs being in the bottom of the Merrimac river, not in the bottom of the river itself, but in the river bottom?  A. Well, at that time, I was not in charge of the timber end of it.  Mr. Maher was in charge.  I was in charge of the sawing department at the factory.  I know that at that time, February 1, 1908, there were a good many logs cut and lying in the vicinity of the river, in the river bottom.  Q. And Mr. Maher was engaged in transporting logs from the place where they had been felled either to higher ground, or up to your factory?  A. Yes, sir.  Q. About how many men had he employed doing that?  A. I don't know.  I don't know how many teams he was employing, but he had quite a number of teams and men.  I had no money to pay the men for their labor in transporting the logs.  I wasn't paying them.  I know Mr. Schussler said that he would not and could not furnish the money to meet the expenses.  Q. And you know that the Century Savings Bank was, don't you?  A. Yes, sir.  Q. And you know the Century Savings Bank has been furnishing money for two or three months or more before that?  A. I know that the business was still going on.  I knew nothing about the money at all because I had nothing to do with the accounting any more. Q. You knew the pay rolls had to be met, how often, weekly, or monthly?  A. Monthly.  Q. Do you know whether or not proceeds were going out of the business to meet these pay rolls?  A. I knew there were shipments being made of gunstocks.  I don't know whether there were enough to meet the pay roll.  Q. And did Mr. Schussler, at the time you told him of the bonus notes, criticize or condemn your actions in any way, find fault with you?  A. I don't remember of him being very severe about it.  I do remember him saying it was news to him.  At that time, February 1, 1908, I confidently expected the adventure would prove a success, and I know from a conversation with Mr. Schussler that that was his expectation.

Schussler also testified:

The first intimation I had that the enterprise at St. James, Mo., was going to run short and fail to liquidate the $20,000 loan and the indebtedness of Barnes to myself was in a letter from Mr. Whinery, I think June 13, 1908. Q. What did you conclude at that time (while at St. James), as to whether that statement of resources was approximately correct after looking into the matter upon the ground? A. We concluded that there were assets enough at that time to take care of all the liabilities. Q. That is, including the liability of Barnes to yourself. A. Yes, sir. After making full inquiry at St. James, on or about February 1, 1908, I was still of the opinion that the project would pay out all right. Q. Is that the reason you didn't call the attention of any officer of the bank to the bonus transaction you discovered on that day? A. The attention of the cashier of the bank was called to it that day. Q. But you did not call attention of any other officer of the bank to it? A. Not at that time; no, sir.

On January 24, 1908, he wrote the following letter:

Floodwood, Minn., Jan. 24, 1908. Mr. H. M. Whinery, Des Moines, Ia.—Dear Sir: Your favor of the 22d at hand and noted. I am very sorry that Mr. Maher and Mr. Barnes do not seem to be able to agree on the running of the gunstock factory, and I realize the fact that Mr. Maher may be somewhat incompetent to run this without the co-operation of Mr. Barnes and I was in hopes that Mr. Barnes would look at this matter in the proper light, that is, that your taking entire charge of this operation was to protect his interest as well as yours and our own. Now, I know Mr. Maher so well, and he has worked under my directions for so long that I know that he is a very level-headed man, and I am convinced that he would not take the stand that he does, unless there were excellent reasons for it. You understand Mr. Maher has no interest in that operation whatever except to protect our mutual interest while Mr. Barnes has. In thinking the matter over and weighing all the facts in the matter, I do not think that Mr. Barnes is entitled to a great deal of consideration so far as his word is concerned. As stated to you before, Mr. Barnes has made so many promises to me, and as yet he has failed to carry out one single promise, and this certainly does not speak well for him. Furthermore, Mr.

Barnes has misled us, and we also think you in what he has done down there previous to your taking hold. We find that before the contract with the government was canceled that he shipped two cars of government gunstocks to F. Smith & Son, of Clinton, Iowa. These shipments were made May 25th, Car No. 98253 and June 20th, Car No. 74295 and the net amount received for them was $5,546.50. After that time, on July 16th, he shipped one car of government stocks to the commanding officer at Springfield, Mass., amounting to about $3,000.00 and this was turned in to you to take up a note which you held against him. Now, according to the contract that we had with Mr. Barnes and yourselves, all the government stocks shipped were to apply on the liquidation of the indebtedness for the purchase of this timber, which was not done, and we consider, under the circumstances, that the two cars shipped to F. Smith & Son were technically stolen by Mr. Barnes and the funds misapplied. Had the two cars, instead of being shipped to Smith & Son, applied on the government contract, the probability is that the government contract would not have been canceled, and there is no question in my mind but what these shipments were made to defraud his creditors in the timber deal, by Mr. Barnes. Under the circumstances, I cannot consider that Mr. Barnes has dealt with us squarely, and I do not think that he will in the future, and, in my opinion, it is a question at this time whether we are going to get a square deal down there, or whether you are going to allow Mr. Barnes to run this gunstock factory in the manner in which he is, and eat up the profits by employing a lot of incompetent boys at large salaries, and as Mr. Maher says, there is no use in trying to save $20.00 in the logging operation if Mr. Barnes is going to squander $40.00 in cutting out the gunstocks. Now we are just as anxious to have this deal worked out and squared up as soon as possible as you are, yet we do not feel that we want to throw away our only chance to get squared up with Mr. Barnes. There are two or three matters to consider, how serious or important they are, I do not know. First, Mr. Barnes holds the orders on which these gunstocks will be shipped. Will it be possible for you to get orders direct? I should think it would. Second, Mr. Barnes has the patterns for making these gunstocks. You could undoubtedly get new patterns from the people whom you sell to, and I think you

are in position to find out the price which we should get for these stocks. Third, Mr. Barnes owns the machinery for manufacturing gunstocks. This is not located on property which you own or control, but the machinery has been purchased from funds received from you or us, or from the sale of material cut from these lands, and I should think that at this time you should insist on Mr. Barnes giving you a bill of sale of all his personal property used in the manufacture of these gunstocks, and if he does not do it, think you should take action and attach this machinery. Mr. Barnes should be given to understand that in taking hold of this matter, we are trying to protect his interest as well as our own, and that he should work in conjunction with us, and not against us, and we do not consider it right that he should employ his relatives, who are incompetent, and pay them large salaries when he could get other men who are competent. I have no objection and I do not think Mr. Maher has, to his employing his relatives providing they were competent and would work, but Mr. Maher does not consider that they are doing this, and I would trust his judgment in the matter, and while he does not know anything about manufacturing gunstocks, yet he does know when men are working and when they are simply soldiering. I would like to have Mr. Barnes take the correct view of this thing, and thereby set himself right with the interests who are trying to protect him, and, in my mind, if this can be done, things would work very satisfactorily, but if Mr. Barnes will not work in this way, I think Mr. Maher would have no difficulty in getting some one competent to run this gunstock factory. Yours truly, M. H. Schussler.

This is substantially the testimony relied upon, pro and con, on the absolute defense pleaded by Schussler, save it is shown that the Bank continued to advance money for the benefit of the enterprise after February 1st, when Schussler discovered the bonus notes, and down to the time the matter proved a failure and Barnes and Schussler brought their action.

In connection with the facts, many legal propositions are argued, to some of which we now refer.

Appellee's counsel strongly insist that the Bank should

not be charged with the fraud of its cashier, for the reason that he (the cashier) was acting in his own interest, and not

for the Bank, and that any presumption of knowledge on the part of the Bank is rebutted because of the cashier's personal interest, and his evident design to keep the matter from the knowledge of the Bank. That such a rule obtains in some cases is undoubtedly true. *Bank v. Gifford,* 47 Iowa, 575; *Hummel v. Bank,* 75 Iowa, 689; *Findley v. Cowles,* 93 Iowa, 389; *Bank v. Gunhus,* 133 Iowa, 409; *Van Buren County v. Surety Co.,* 137 Iowa, 490; *German Bank v. National Bank,* 122 Iowa, 737, and other like cases.

1. BANKS AND BANKING: representations of officers: fraud: liability.

But we doubt if this rule is applicable here. In making the loan, and in all matters properly referable thereto, including the representations made to the guarantor, Schussler, the cashier was acting for the Bank, and if he undertook to state Barnes' liabilities, it was his duty to do so correctly; and, if he failed in this, his act was the act of the Bank, on the theory that where one of two innocent parties must suffer from the wrongs of a third person, he who placed the wrong-doer in a position to do the wrong must suffer the consequences of his act. This last is a short statement of a rule frequently applied in equity, and we think should govern here. *Stowe v. U. S.,* 19 Wall. 13 (22 L. Ed. 144); *Martin v. Webb,* 110 U. S. 7 (3 Sup. Ct. 428, 28 L. Ed. 49); *State ex rel. Carroll v. Bank,* 139 Iowa, 338; *Simon v. Brown,* 38 Mich. 552; *Wolfe v. Pugh,* 101 Ind. 293; *Dewing v. Hutton,* 48 W. Va. 576 (37 S. E. 670).

Whinery was acting for the bank in a matter within the scope of his authority, and with respect to matters committed to his care, to wit, the loaning of money, and the securing of

sufficient security for the loan, and made the representations charged while acting as such agent. It is immaterial, then, that he acted fraudulently, and to subserve some purpose of his own, so long as the party with whom he was dealing had no knowl-

2. SAME: fraudulent acts of officer: effect.

edge of the facts.  *Locke v. Stearns,* 1 Metc. (Mass.) 560 (35 Am. Dec. 382) ; *Jewett v. Carter,* 132 Mass. 335; *Wickham v. Evans,* 133 Iowa, 552; *Rhomberg v. Avenarius,* 135 Iowa, 176.

We have no hesitation in holding that the Bank is responsible for whatever representations its cashier made to Schussler regarding Barnes' indebtedness before he (Schussler) signed the guaranties.  But, it is said he made no false representations as to Barnes' indebtedness; that what he said related to the indebtedness of Casebeer & Barnes, and was absolutely correct, and that, as a matter of fact, Barnes was not otherwise indebted than as stated at the time the representations were made.  As the business seemed to be conducted in the name of Casebeer & Barnes, even after the dissolution of that firm, and as all parties understood that the indebtedness inquired about referred to Barnes' liabilities, whether in his own name or in the name of Casebeer & Barnes, appellee's position in this respect is not tenable.  Much might be said, however, in favor of the proposition that, at the time the representations were made, the bonus notes and the alleged collateral agreement to pay the bank $1,000 (not represented by notes, or any other writing) were not effective as obligations to pay, and that they did not become effective until the loan was fully consummated by Schussler signing the guaranties.  Of course, they did not become effective and enforceable obligations until the loan was finally closed; and it is doubtful if there ever was any enforceable agreement to pay the Bank the $1,000 bonus on the loan.  The testimony is fairly in equipoise on this proposition.  But, as Schussler was endeavoring to find out Barnes' financial condition before signing the notes, it seems to us that good faith on the part of the cashier of the Bank, and fair dealing required a disclosure from him of these contingent liabilities.  Schussler's inquiry might have been more specific, but he had the right to assume that the loan, in its entirety, was represented by

3.  SAME: fraud: concealment of facts.

the papers which he was shown and was induced to sign, and that there were no side agreements which entirely changed the situation. The cashier's conduct cannot be explained upon any other theory than a deliberate purpose to deceive Schussler; and that he was deceived goes without saying. *Barnes v. Century Savings Bank,* 149 Iowa, 367.

If this were all of the case, it would be a reasonably clear one for Schussler, but, unfortunately perhaps for him, he did not, after the discovery of the fraud which had been perpetrated upon him, act with that promptness

4. SAME: fraud: rescission: waiver.

which the law requires. On the contrary, instead of immediately rescinding and disapproving the contracts because of the fraud, he proceeded with his part of the agreement, both he and Barnes believing that the venture would, in the end, be a successful one, and that he (Schussler) would be able to save himself from all loss and secure the repayment of Barnes' indebtedness. But his conduct, after discovering the fraud which had been perpetrated upon him by the cashier, as disclosed by the testimony, has already been set out, and, to our minds, it makes a clear case against his right to rescind and to have the notes canceled. Not only did he do the things already narrated, but, by continuing on with the enterprise, he allowed the Bank to advance more money to carry out the enterprise, and to incur additional liabilities, after he was fully advised of the making of some, if not all, of the bonus notes. Schussler, not only failed to repudiate, but he continued to co-operate with Barnes and Whinery in an endeavor to make the enterprise a success, and said nothing to any officer of the Bank, save Whinery, regarding the bonus notes, although he knew at that time that the Bank had no knowledge thereof. The duty of one defrauded as Schussler was is well settled in law.

The rule has been succinctly stated in *Grymes v. Sanders,* 93 U. S. 55 (23 L. Ed. 798) as follows:

Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. *Thomas v. Bartow*, 48 N. Y. 200; *Flint v. Wooden*, 9 Hare, 622; *Jennings v. Broughton*, 5 De G., M. & G. 139; *Lloyd v. Brewster*, 4 Paige (N. Y.) 537 (27 Am. Dec. 88); *R. R. Co. v. Row*, 24 Wend. (N. Y.) 74 (35 Am. Dec. 598); *Minturn v. Main*, 7 N. Y. 220; 7 Rob. Pr., chapter 25, section 2, page 432; *Campbell v. Fleming*, 1 Ad. & Ell. 41; *Sugd., Vend.* (14th ed.) 335; *Diman v. R. R. Co.*, 5 R. I. 130.

This rule has many times been followed by this court. See *Rawson v. Harger*, 48 Iowa, 269; *Evans v. Montgomery*, 50 Iowa, 325; *Giltner v. Rayl*, 93 Iowa, 16; *Moore v. Howe*, 115 Iowa, 62; *German Bank v. Des Moines Bank*, 122 Iowa, 737; *State Bank v. Brown*, 142 Iowa, 190.

In the *Moore* case it was said:

A party to an agreement induced by fraud or deceit is held to the duty of electing either to execute or rescind the contract at the time of discovering the wrong, or within a reasonable time thereafter. *Rawson v. Harger*, 48 Iowa, 269. Sometimes this question as to what is a reasonable time is for the jury, but we have no hesitancy in saying, as a matter of law, that the retention of a retail stock of goods, and sale therefrom in the ordinary course of business, and appropriating the proceeds thereof, for nearly four months after acquiring knowledge of the alleged fraud, will preclude a subsequent rescission of the contract. Such treatment of the property is an unequivocal election to accept the goods and carry out the contract. Taking any benefit or changing the condition of the property bought after learning of the fraud has been adjudged a waiver of the right to rescind. *Cobb v. Hatfield,*

46 N. Y. 533; *Negley v. Lindsay*, 67 Pa. 217 (5 Am. Rep. 427). Continued dealing with or use of the goods purchased, in reference to the fraudulent transaction as if it were subsisting and binding, is also such a waiver. *Bassett v. Brown*, 105 Mass. 551; *Schiffer v. Dietz*, 83 N. Y. 300; *Foster v. Rowley*, 110 Mich. 63 (67 N. W. 1077). Having made his election, plaintiff must abide by it.

In the *German Savings Bank* case this language was used:

A party defrauded must be diligent. The means of knowledge are equivalent to knowledge. A clew which, if followed up diligently, would lead to a discovery, in law is equivalent to a discovery—equivalent to knowledge. *Norris v. Haggin* (C. C.) 28 Fed. 275; *Wood v. Carpenter*, 101 U. S. 139 (25 L. Ed. 807); *New Albany v. Burke*, 11 Wall. 107 (20 L. Ed. 155). 'A party seeking relief on the ground of fraud must aver and show that he used diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it.' *Buckner v. Calcote*, 28 Miss. 432. The principle is so elementary that possibly the citation of authorities is unnecessary. The rule that a party must rescind within a reasonable time after the discovery of the fraud is equally well established. *Stetson v. Northern Investment Co.*, 104 Iowa, 393; *Moore v. Howe*, 115 Iowa, 62; *United States Stock Co. v. Railway*, 34 Ohio St. 450 (32 Am. Rep. 380); *Veasey v. Graham*, 17 Ga. 99 (63 Am. Dec. 228).

Again the court, in *State Bank v. Brown*, observed:

It is an universal rule that, where one is induced to purchase property by fraud and deceit, he must, within a reasonable time after discovering the fraud, rescind the contract, and place the other party in *statu quo*. In other words, he has an election, after discovering the fraud or after the means of knowledge are at hand, to treat the contract as valid or to rescind, and, if he fails to act promptly and to rescind, he will be held to have waived his right to do so. *Moore v. Howe*, 115 Iowa, 62; *Bank v. Bank*, 122 Iowa, 737; *Stetson v. Investment Co.*, 104 Iowa, 393, and cases cited.

In order that this rule shall apply, it is not necessary that the party defrauded have full knowledge of the entire transaction. Means of knowledge is the equivalent of actual knowledge, and if he has knowledge or means of knowledge that a fraud was committed, equity requires him to act with reasonable promptness, even though he may not be fully cognizant of the extent of the fraud. See cases hitherto cited. As a matter of fact, Schussler did not act until this suit was commenced, and then did not bottom his prayer for relief upon fraud in the original transaction. This claim was not introduced until long afterward, when the main pleadings were filed. A careful reading of the record satisfies us that Schussler has failed to sustain the complete defense pleaded by him.

5. SAME: rescission: knowledge of fraud.

II. As a partial defense, Schussler pleaded a misapplication of the funds arising from sales of the products of the Missouri timber venture, and a failure on the part of Whinery and of the Bank to comply with the terms of the collateral agreements (which we have hitherto set out) and a failure to make a proper accounting of his trusteeship. The first of these contracts was drawn by Schussler himself, and was executed at the time the guaranties of the notes were signed. Its terms have been fully set forth. The second one was executed December 17, 1907, and it also has been set out. This second contract expressly ratifies all that Whinery had done down to the time of the signing of this last agreement. Appellant Schussler contended that Whinery or the Bank misapplied more than $13,000 worth of the funds arising out of the sale of manufactured products from the Missouri enterprise, and that this amount should be applied on the notes upon which he was guarantor. There is a dispute in the facts regarding these claimed misappropriations, due largely to the construction placed upon the agreement to which we have referred. Reference should, at this time, be made to the contract under date November 8, 1907, which placed

6. SAME: contracts: settlement and ratification: evidence.

Panabacker and Barnes in charge of the business. Turning
back to the contract made when the notes were executed, it
will be noticed that the agreement covered proceeds from the
sale of gunstocks to the United States government, and no
others. It is contended, however, that Barnes and the Cen-
tury Savings Bank misapplied funds coming from this source.
It will be noticed that the agreement of December 17, 1907,
confirms our interpretation of the previous contract, and also
recognizes, appoints, and confirms Whinery as trustee, not
only for the Bank, but also for Schussler and Barnes as well.
This contract provides that the bank should be reimbursed
for previous and for subsequent advancements in the prose-
cution of the work, and it also provides that all shipments of
lumber, etc., and of the proceeds thereof, shall be paid to
Whinery, as trustee, for the uses and purposes expressed in
the contract; and Whinery was relieved of all responsibility
for Barnes' conduct. It also contained a ratification of Whin-
ery's transactions as trustee, from the beginning of the deal
down to the execution of this last contract. It appears from
the record that the Bank made a full and complete statement
of all transactions occurring after the date of this contract;
and, by agreement with counsel, this matter was not entered
into any further than to receive the statements, etc., made by
Whinery, as trustee, or by the Bank, covering the trans-
actions for which it was responsible. The trial court, there-
fore, refused to go into an accounting of the transactions
after the making of this second agreement, but did consider
the partial defense pleaded by Schussler as to matters oc-
curring before the making of this last contract. Of this,
neither party may now complain; appellant Schussler does
not, and is really in no position to do so, and the Bank is
not in position to ask it because its pleadings were not in
proper shape to demand it. We go back, then, to the trans-
actions occurring before this last agreement was entered into.

At the threshold of the case, we are met with the ex-
press ratification of all preceding transactions made in the

VOL. 165 IA.—12

contract of December 17th. This must be overcome before Schussler is entitled to any relief, and he does not do this in a satisfactory manner. No fraud or deception was used in the making of this last contract, and it stands, at least, as a prima facie settlement of all previous matters. But, it is said that proceeds from the sales of gunstocks to the United States government were diverted. The testimony in support of this claim is not very satisfactory; and as to other items of credit received by Whinery, under the original contract, the showing as to the expenses connected therewith, and as to the net amount received by him, is such as to lead us to believe that Whinery in fact received nothing therefrom with which the Bank should be properly charged.

Schussler claims that one sale of gunstocks, amounting to $3,000, should have been credited on his obligations. It seems that the amount of the proceeds from this sale was first applied on an indebtedness of Casebeer & Barnes, and that the Bank had the right to apply it in this manner. Aside from this, under the original contract, the Bank was authorized to apply it upon the unsecured notes held by it.

The Bank is sought to be charged with another sale made to Smith & Son. This was not a sale to the government, and the Bank did not, in fact, receive the money. It was used by Barnes in the conduct of the business, and to meet the expenses thereof. At any rate, the Bank had the right to apply the proceeds thus received to the unsecured notes held by it. Moreover, this and other transactions were ratified by Schussler after being fully informed thereof.

A car load of gunstocks was shipped to the government under a renewal contract, and the net proceeds therefrom amounted to $2,994.80. Part of this was originally credited to the Casebeer & Barnes indebtedness to the Bank, but was afterward replaced by money arising out of the collaterals held by the Bank, and the entire amount was finally used in meeting operating expenses. Even if this amount should

be charged to the Bank, it would be applied upon its indebtedness until that amount was fully paid.

Without further adverting to the matters occurring prior to December 17th, we are constrained to hold that Schussler ratified all these transactions, and that, if he did not, neither Whinery nor the Bank received anything more than that to which they were entitled; that considerable of the proceeds arising from sales of gunstock was used in payment of the current expenses of the enterprise, and that no part of the fund specially pledged by the original agreement was diverted from its proper channel.

After the agreement of December 17th, Whinery became a trustee for all parties, and it is doubtful, to say the least, whether Schussler in this action may complain of any diver-

7. SAME: trusts: accounting.

sion of the funds made by his trustee. He was acting for Schussler, as well as for the Bank, and the Bank, in such circumstances, would only be liable as *cestui trustent* for funds shown to have been received by it in excess of those to which it was lawfully entitled. Even if liable for the acts of Whinery after that date, under the December contract, Schussler would have to show such diversions, and this he has not done. True, Whinery, in his capacity as trustee, would be obliged to make a full and complete accounting to the beneficiaries of the trust, but, in this matter, he was acting for each and all of the parties, and, for a failure to do so, the Bank would not be liable unless it received from Whinery something more than it was entitled to. In so far as it is concerned, it made a full and complete statement of all that passed through its hands which it tendered to Schussler, and which it produced upon the trial. No objections were made to any of these items upon the trial, and the Bank did all that it could, by way of furnishing a statement as to its receipts and disbursements. As we understand the record, counsel for Schussler abandoned the theory that the Bank did not make a sufficient accounting of all matters that passed over its counters, after the execution of

the December contract, and did not ask for any relief on the theory that Whinery had misapplied any of the moneys coming into his hands, or into the hands of the Bank, after that time. The government contract had long expired at the time of the making of the December contract, and all parties were attempting to meet their losses and secure the payment of their debts through the operation of the plant after that date, and in this there was a dismal failure. Surely the Bank should not be charged with any mismanagement by Whinery, as trustee, or the other parties having charge of the operation of the plant, after that date, unless it received, from the trustee, funds to which it was not entitled. True, each of the beneficiaries was entitled to a full accounting from his trustee, Whinery, but the Bank should not suffer from his failure to account. It, as we have already suggested, made all the accounting that it was possible for it to make. Whinery, as trustee, was not a party to this suit.

III. The observations made in the last preceding paragraph disposes of the cross-appeal by the Bank. Schussler practically abandoned his proceedings after the accounting by the Bank for transactions occurring after December 17th, and the Bank had no proper pleading of its own, as against Schussler and Barnes, which would entitle it to an accounting.

Moreover, its action for an accounting if it had any, was against the trustee, Whinery, unless it appeared that some of the other beneficiaries received more than they were entitled to, and there is neither pleading nor proof to that effect. It was not entitled to an accounting, and it does not claim that Schussler received any funds to which he was not entitled.

On the whole record, we are constrained to believe that practically all the parties thought that by continuing the venture it could be made to pay all of Barnes' indebtedness to each of them, but, like many other plans of men, they went awry, and did not prove as profitable in practice as upon paper, and because of miscalculation, all must suffer. Schussler was evidently deceived by Whinery, but after that, on

account of the hopes entertained by him, he elected to go ahead with the transaction, although knowing of the deceit practiced upon him by Whinery, thinking that the venture could be made to pay out, and by reason of his conduct after the discovery of the fraud and his election to proceed with the enterprise, notwithstanding the fraud, waived the deceit practiced upon him, and cannot now be heard to complain.

The case has received most careful consideration at our hands, with the result that the judgment and decree must on both appeals be, and it is—*Affirmed.* All Justices concur.