IMA TESENE, Appellant, v. IOWA STATE BANK et al.,
Appellees.

**BANKS AND BANKING:  Deposits—Trust Funds—Notice to Bank.**
1  Where a cashier of a bank, for the purpose of securing a de-
posit, undertook, in accordance with established practice, not
only of his own bank, but of other banks in the city, to assist
in the procuring of the appointment of a widow as guardian
of her minor children, and to furnish the necessary bond, so
that she could secure payment from an insurance company of
the amount due said children on the policy of their deceased
father, and told the widow and an insurance adjuster that the

matter had been properly attended to, and that her appointment as guardian had been made, and that a bond was furnished, when, as a matter of fact, the appointment was never made, and a bond was never furnished, the bank was, upon the receipt of such funds from the widow, chargeable with the knowledge of the trust character of the deposit, and that the widow was not the duly appointed and acting guardian of the children, and that she had no authority to demand or receive from the bank the said deposit.

**BANKS AND BANKING: Trust Funds—Notice to Official is Notice to Bank.** Notice to the vice-president of a bank that a deposit was insurance money, received from a policy in which minor children were beneficiaries, was a notice to the bank.

**BANKS AND BANKING: Deposits—Trust Funds—Liability for Wrongful Payment.** A bank in which had been made a deposit of insurance money belonging to children of the depositor, a widow, who had not been appointed guardian, and had no authority to receive the money from the bank, is liable to account to the children for such funds, after having paid them to the widow, who lost them.

**INTEREST: Bank Deposits—Unauthorized Payment.** Interest is not chargeable against a bank on an ordinary deposit of money until payment has been demanded and refused; but where the deposit has been wrongfully paid out to an unauthorized person, or wrongfully appropriated or converted by the bank, interest may be recovered.

*Appeal from Cerro Gordo District Court.*—M. F. EDWARDS, Judge.

SEPTEMBER 20, 1919.

ACTION in equity to establish a trust, and to recover the amount of a deposit in the defendant bank. The petition was dismissed, and the plaintiff appeals.—*Reversed and remanded.*

*Ira W. Jones* and *Blythe, Markley, Rule & Smith,* for appellant.

*Senneff, Bliss, Witwer & Senneff,* for appellees.

WEAVER, J.—The petition shows the following alleged state of facts: Plaintiff is the minor daughter of John H. Tesene, who died in Cerro Gordo County, June 11, 1902. His life was insured for the sum of $5,000, payable as follows: $1,000 to his wife, Wilhelmina, $2,000 to his son Roy, and $2,000 to his infant daughter, Ima, the plaintiff in this action. At the time of and prior to the decease of Tesene, the defendant Iowa State Bank was a corporation, doing a banking business at Mason City, of which bank I. W. Keerl was the cashier and active manager. Soon after the death of Tesene, Keerl, acting for and in the interest of the bank, and in order to secure the deposit of the insurance money in that bank, accompanied the adjuster of such insurance claim to the home of the widow, and informed her that the money so received for her children would be a trust fund, to be kept distinct from her own moneys, and that it would be necessary for her to be appointed guardian for the children and give bond as such; and that, if she would deposit the trust funds in the defendant bank, he would procure the bond for her, and see that the matter of her appointment was properly attended to and arranged.

Thereafter, and in pursuance of this understanding, Keerl caused to be prepared a petition for the appointment of the widow as guardian of her said children, and filed it in the office of the clerk of the district court, and stated and represented to her and to the agent of the insurance company that her appointment as guardian had been made; and thereupon, on June 17, 1902, said agent turned over to the widow a draft for the amount of said insurance, which sum or draft she, in turn, delivered to Keerl for deposit in the defendant bank. On this sum, $1,000 was by the bank credited as a deposit by Wilhelmina Tesene in her own right, and $4,000 to her credit in her capacity as guardian.

It is further alleged that, as a matter of fact, neither

the bank nor Keerl had furnished a guardian's bond, and that the appointment of Wilhelmina Tesene as guardian of her children was never perfected or made, and that said deposit was received by the bank with knowledge and notice of such fact, and that, having such knowledge and notice, it kept and retained said trust funds until the following year, when, acting by Keerl, it permitted said funds to be drawn out of the bank in checks prepared by Keerl and signed by Wilhelmina Tesene, without authority of law, and with full knowledge on part of the bank that the funds were held in trust for said children.

The son, Roy Tesene, appears to have arrived at his majority, and is not, in his own right, a party to this action; but the plaintiff alone, who is still a minor, represented by her said brother as next friend and guardian, asks judgment against the bank and its trustees for the sum of $2,000, with accumulated interest.

The defendants admit the corporate capacity of the Iowa State Bank, that it was organized for the transaction of a general banking business, and that Keerl was its cashier; but aver that he was clothed with only power and authority such as is usually exercised by cashiers of banks under the laws of the state. They admit that the money mentioned in the petition was deposited in the bank, and that it was afterward withdrawn upon checks; but deny that such money was received as a trust fund; deny all knowledge and notice of its alleged trust character; deny that the bank assumed or was under any obligation to guard or protect said fund from misappropriation by the plaintiff's mother; and deny that the bank received any part of the money withdrawn from said deposit, or any benefit therefrom. The answer further alleges that, if it be true that Keerl received or misappropriated any of said fund, he did not do so in his capacity as cashier or agent of the bank, and avers that, if he is chargeable with any

wrong with respect to said transaction, the wrong so done was while acting in his personal capacity, and not as an officer or agent of the bank; and because of such fact it is alleged that his notice or knowledge cannot be imputed to the bank.

On trial to the court, the evidence offered tended to show, without controversy, that, at the time of the transaction in question, Keerl was the cashier and the active managing officer of the bank in its daily routine of business; that he knew of the death of John H. Tesene, and that his widow and children were the beneficiaries of life insurance, and that of this sum $4,000 was payable to plaintiff and her brother, the infant children of the deceased; that he solicited the deposit of this money for the bank, and, as an inducement or aid thereto, he prepared the petition for the appointment of the widow as guardian, and promised to procure the necessary bond; that, as a matter of fact, he did not furnish the bond, and the appointment was never made: but it is evident that both Wilhelmina Tesene and the insurance company relied upon his assurance that the matter had been properly attended to, and in such reliance the money was paid over and at once deposited in the bank in the form of a draft made payable to "Wilhelmina Tesene" and "Wilhelmina Tesene, guardian of the estates of Roy Tesene and Ima Tesene," and endorsed by her in identical form; that, in recognition of the separate interest of the widow in her own right to the sum of $1,000, and of the right of her children in the remainder of $4,000, said sums were placed in separate deposits. One of these accounts was entered upon the books of the bank in the name of "Wilhelmina Tesene," and the other in the name of "Mrs. J. H. Tesene."

At the same time, Keerl delivered to the widow a pass book, representing the deposit of $4,000 made out in the name "Wilhelmina Tesene, Guardian of Roy Tesene and

Ima Tesene." It further appears that said sum of $4,000 was withdrawn in the following manner: Wilhelmina Tesene, desiring to remove from the farm where she lived to Mason City, consulted with Keerl on the subject, and she says he advised her that she could use the money, or some of it, in purchasing a home; or, to use her language, "that she could take the money and invest it in a house in town, as guardian over her children." For this purpose, she gave a check, prepared by Keerl, payable to herself, for the sum of $2,000, and signed it "Wilhelmina Tesene, guardian." With reference to the remaining sum of $2,000, she testifies, and it is not disputed, that Keerl told her he had an application for a loan on a dwelling, and asked that she let the bank make the loan, and that she sign the check "so they could use that money to put out at 7 per cent interest;" and for this purpose she made the check. It was drawn by Keerl, made payable to himself, and signed by her. For this check Mrs. Tesene received no money, property, or thing of value except, as she says, Keerl delivered to her a mortgage supposed to represent the alleged loan, which instrument she placed in one of the bank's safety deposit boxes, of which Keerl had a duplicate key, and said mortgage afterward disappeared from the box. She never received anything on this mortgage, and is unable to give any description by which it may be identified.

It further appears that, at some time after the $2,000 was used in the purchase of a house for Mrs. Tesene, she became embarrassed financially, and, on the advice of Keerl, she made to him a mortgage on said home property, to secure an alleged debt for $2,000, but, in fact, wholly without consideration, as a protection to her, "so no one could get anything against it." This mortgage she supposed was still held in the bank, until after Keerl left the bank, when she learned, through its president, that the instrument had been sold to an eastern purchaser, who was demanding pay-

ment thereon. She then went to Keerl, who said he would go to the bank and see about it, or fix it up; but nothing was done to relieve her. The mortgage was foreclosed, and the property was sold and lost to her. She has never paid the debt to her children, and is insolvent, and unable to satisfy their claims.

Upon the subject of the authority of Keerl to represent the bank in its business, it is conceded by defendants that he had and exercised the usual and customary authority of bank cashiers in this state. It also appears by the testimony of witnesses, among whom were stockholders, officers, and employees in the bank, that he was the real, active head and manager of the bank's business. One director testifies: "He had personal management of the business." Another says: "As nearly as I could learn, he had been practically the managing officer." The vice-president says:

"Keerl had active management of the bank, and looked after getting deposits and making loans. We tried to get our share of deposits, and pursued about the same course to get them as other banks do. When we knew of an account which might be gotten, we solicited the account—Keerl or I."

Another director testifies: "Keerl had the active management of the bank; think he practically had the sole management." The bookkeeper says Keerl was the general manager of the bank, and "dictated the policy of the bank practically, so far as the getting of deposits and the loaning of money is concerned."

Counsel for appellee argue that, as cashier, Keerl was without express or implied authority to promise or undertake to provide bonds for guardians, or to assume any responsibility of that character; and some of the directors testify that no such authority was ever given. It may be conceded, we think, that there is no showing that the

board of directors, by any express or formal vote or rule
or resolution, granted any authority of that nature; but it
does appear, too clearly to admit of doubt, that it was a
common practice, pursued not only by this bank but by the
banks of the city generally, to seek the deposit of trust
funds, and that, in order to secure them, they did frequent-
ly undertake to assist administrators, guardians, and other
trustees in qualifying for their trusts, and in doing what
might be necessary to that end, including the procurement
of necessary bonds. There is nothing unlawful or repre-
hensible in such practice, nor is it in any manner incon-
sistent with the business the ordinary banking concern is
established to carry on. The vice-president of the bank,
who seems to have been the only officer, except Keerl, who
gave the business any serious attention, being asked if it
was their practice to furnish bonds for trustees, in order
to obtain their deposits, answered, "Well, I don't know,
I suppose perhaps it was, somewhat,—I don't know;" and,
on being further pressed, he said:

"Well, you understand, I myself never looked after
that, or got any of that business. In a general way, I knew
what the practice was there. I think that was the common
practice of banks here in town, more or less."

On the same subject, another director says:

"We always furnished an administrator, guardian, or
township or county officer bondsmen, as long as they put
such funds in the bank. I think that was generally done
by the banks here in Mason City."

No officer, director, or employee denies such practice.

It appears also to have been a part of the recognized
duty or business of the bank or its cashier to negotiate
loans for their customers and others desiring such aid.

Finally, in so far as it becomes important to inquire
into the question of actual notice to the bank of the deal-
ings between its cashier and Mrs. Tesene, as distinguished

from constructive notice, if any, it should be said that the vice-president, being interrogated upon the subject, testified as follows:

"I heard of the death of Mr. Tesene. Don't know whether Mr. Brier was a patron of the bank at that time or not. I saw Mrs. Tesene in the bank with Keerl. Can't remember seeing Brier in there with them. Q. You knew of Tesene's insurance money being deposited there in the bank, did you not? A. Well, I knew that there was some money deposited there. Keerl looked after that matter, and did all the business connected with that. All I knew that there was some money deposited there, and that Keerl and Mrs. Tesene were looking after the business in connection therewith. Don't remember the amount. I learned that this money had been deposited there, and probably understood at the time that it was the proceeds of an insurance policy. Q. And you also knew from the papers, or from Keerl, that part of that belonged to the widow, and part to the children? A. I heard them say something about that, I think. It appears the part that belonged to the widow was deposited to the credit of Mrs. J. Tesene, June 26th, 1902."

The other directors, or most of them, deny having any actual knowledge of the business with Mrs. Tesene.

The foregoing is substantially all the pertinent evidence produced in the trial.

It should, perhaps, be added in this connection that, from a time prior to the commencement of this action, the Iowa State Bank has been in the course of voluntary liquidation, and that the trustees engaged in closing up the business are defendants herein.

On this showing, the trial court denied the plaintiff any relief on account of the deposit above mentioned, and in that connection, entered of record its conclusion of law

1. BANKS AND BANKING: deposits: trust funds: notice to bank.

controlling the result of the controversy, in the following words:

"The acts of the cashier, I. W. Keerl, at the time in question, concerning the subject involved in these causes, are not within the general rule as to authority, notice, and knowledge of the agent being ordinarily imputed to the principal, but rather within the exception to the general rule, which exception is that, when the conduct of the agent is such as to raise a clear presumption that he would not communicate the facts in controversy, as when the communication of such a fact would necessarily prevent the consummation of a transaction not regular on its face, in the ways of carrying on the business of any well regulated bank, and which irregular transaction the cashier in the instant cases was a party to, and one, apparently, in which he was personally interested, and not the defendant bank. It being made clear from the evidence in the cases that the cashier in the matter involved in these cases has placed himself in a position which conflicts entirely with the idea that, in so acting, he represented the interests of the defendant bank. Therefore, the defendant bank is not bound by either the knowledge or acts of the cashier, I. W. Keerl."

We are strongly impressed with the conviction that the rule here stated is not properly applicable to the issues in this case, or to the well proved facts developed in the trial. The following are some of the reasons compelling this conclusion:

I. That Keerl was acting for the bank in soliciting the deposit of this trust fund, and that his act in that respect was within the scope of his authority and agency, there can be no reasonable doubt. His undertaking to assist the woman in procuring her appointment as guardian for her children, and to furnish the necessary bond, was in accordance with the established practice of the banks of that

city, including this bank, and was a legitimate inducement for him to offer for the business. There is nothing whatsoever in the record to indicate that, at that time, he contemplated any wrong or fraud upon the bank or upon the widow and children, for his own private advantage or benefit. In other words, he was not acting in hostility to the bank of which he was an officer, but in promotion of its legitimate business, and the knowledge which he had or obtained in negotiating the deal was, upon every sound principle of the law of agency, the knowledge of his principal. He knew that $4,000 of the deposit thus obtained was the property of the infant children of John H. Tesene, deceased, and, as a conclusive presumption of law, he knew also that such money in the hands of any person or corporation knowing the truth as to its ownership was a trust fund, and that its possessor, charged with knowledge of its character, could not consume it, or convert it, or pay it over to one having no authority to demand or receive it, without becoming liable to make good the loss to the true owner. He acquired his knowledge in the very transaction by which the bank, through him, obtained the deposit. The bank is a corporation, and, as such, can do business, accept deposits, pay checks, enter into contracts, or receive or impart information, only as it acts by and through its agents; and, in the very nature of its organization, it must be held liable for what its agents do, within the scope of their authority, and be charged with the knowledge which those agents acquire in doing its business.

We hold, therefore, that the defendant bank must be held to have had knowledge of the trust character of this deposit, and to have known that Wilhelmina Tesene was not the duly appointed or qualified guardian of Roy Tesene or Ima Tesene, and that she had no authority to demand or receive from said bank the said deposit of $4,000.

II. Nor do we need to rest this finding entirely upon

the notice imputed to the bank through the knowledge of Keerl; for, as we have seen, the vice-president of the bank, who was, to some extent, actively engaged in its business, admits that he knew of this deposit from the first, understood that it was insurance money, and that the children were beneficiaries. Indeed, even if it had appeared that, in obtaining the deposit for the bank as he did, Keerl had no authority to promise or undertake to procure a bond for the widow, or to represent to her and the insurance agent that she had, in fact, been appointed guardian, there would still be no sound reason for holding that his knowledge of the truth in that respect is not imputable to the bank. He did know the truth that the fund belonged to the infant children, who had no guardian or trustee to act in their behalf, and that whosoever should receive it from the insurance company would become a trustee for their benefit, and bound to account for it to them or to some other person having lawful authority to demand it in their interest.

The bank's liability is not necessarily predicated upon the failure to provide the bond, as promised by Keerl, or upon his false representation that the mother's appointment as guardian had been made, or upon his authority to make such promise or representation, but upon the fact that it took the deposit, with knowledge that the money belonged to the children, and that their mother had no authority to receive, use, or control it. For all practical purposes in receiving the deposit, Keerl was the bank; and the circumstances which would have made him chargeable as a trustee, had he been acting in his individual capacity, are sufficient to charge the corporation which he represented. See *Barnes v. Century Sav. Bank,* 165 Iowa 141, 171, 172; *United States Fidelity Co. v. United States*

2. BANKS AND BANKING: trust funds: notice to official is notice to bank.

3. BANKS AND BANKING: deposits: trust funds: liability for wrongful payment.

*Nat. Bank,* 80 Ore. 361; *Security Sav. Bank v. Smith,* 144 Iowa 203, 207; *Tatum v. Commercial Bank,* 193 Ala. 120; *Bobb v. Savings Bank,* 23 Ky. L. Rep. 817 (64 S. W. 494); *Deposit Bank v. Fleming,* 19 Ky. L. Rep. 1947 (44 S. W. 961); *Holden v. New York & Erie Bank,* 72 N. Y. 286; *Pennington v. Third Nat. Bank,* 114 Va. 674 (77 S. E. 455); *Lowndes v. City Nat. Bank,* 82 Conn. 8 (72 Atl. 150); *State Bank v. People's Nat. Bank,* 118 N. Y. Supp. 641; *First Nat. Bank v. Peck,* 180 Ind. 649 (103 N. E. 643); *L'Herbette v. Bank,* 162 Mass. 137; *Hanson v. Heard,* 69 N. H. 190; *Gibson v. National Park Bank,* 98 N. Y. 87; *McMahon v. German-Am. Nat. Bank,* 111 Minn. 313 (127 N. W. 7).

The *L'Herbette* case, supra, is quite in point upon one of the features of the present case. There, the cashier secured plaintiff's money for deposit by an unauthorized promise to pay interest, and to find investments in stocks and bonds. The cashier did not put the money in the bank, but embezzled it. The court held the bank liable, saying:

"The bank is bound because its cashier, assuming to act in its behalf, received the plaintiff's money as deposited in the bank, and the fact of his making invalid agreements * * * does not have the effect to exonerate the bank from its liability to refund the money."

Under very similar circumstances, the New Hampshire court, in *Hanson v. Heard,* supra, says:

"When the plaintiff's money went into the cashier's possession, it was in the bank's possession. * * * If it was lost afterward, through carelessness, larceny, or other means, it was the bank's loss."

In the instant case, the money not only went into the cashier's possession, but actual possession of the bank, as well, and was entered as a deposit upon its books. At least $2,000 of it was taken or abstracted from that deposit by the cashier, on the unauthorized check of Mrs. Tesene, with the promise to invest it in a mortgage; and it

further appears very satisfactorily that he embezzled this fund, either in its original form, or in the form of the mortgage which he professed to have procured for her. The situation as to the other $2,000 is somewhat different, in that it appears that the money was paid out to Mrs. Tesene, or was used in purchasing property for her; but, in view of the fact that the cashier had no more legal right to pay the money to her or for her use than to expend it for his own personal benefit, the difference is not material.

This holding is not inconsistent with the precedents cited by the appellee, to the effect that a bank receiving a deposit from a guardian or duly authorized trustee is not charged with the duty of supervising the expenditure of such deposit, and ordinarily may safely honor and pay the checks of the depositor. In this case, the mother of plaintiff doubtless acted innocently in receiving and depositing the money as she did, but her act was without authority of law, and of this the bank and Keerl were fully aware. The deposited money was received with knowledge that it belonged to the plaintiff and her brother, to whom alone, or to their duly appointed guardian, the bank was bound to account; and it is no defense to their demand for such accounting to plead or prove that the bank, which is chargeable with such knowledge, has paid the money over to the mother, or other person known to be without authority to receive it.

The decree below must be reversed, and the cause will be remanded, with direction to the trial court to enter judgment for the plaintiff against the bank for the recovery of the principal sum of $2,000, with interest at 6 per cent from the date when the bank paid out the money on the unauthorized checks. Upon the subject of interest, the appellee argues for application of the usual rule, that interest is not chargeable against a bank on an ordinary

4. INTEREST: bank deposits: unauthorized payment.

deposit of money until payment has been demanded and refused; but we think that, where the deposit has been wrongfully paid out to an unauthorized person, or has been wrongfully appropriated or converted by the bank, the rule is otherwise, and interest may be recovered.

The costs will be taxed to the appellees.—*Reversed and remanded.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.